# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

C
Guiness United Distillers & Vintners B.V. v.
Anheuser-Bush, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
GUINNESS UNITED DISTILLERS &
VINTNERS B.V., Plaintiff,
v.
ANHEUSER-BUSCH, INC., Defendant.
**No. 02 CIV. 0861(LMM).**

July 12, 2002.

Seller of a brand of scotch whiskey named "Johnnie Walker Red Label" sued beer seller, claiming that a beer bearing the name "Red Label From Budweiser" infringed, diluted, and misappropriated the scotch seller's trademark. On the scotch seller's motion for a preliminary injunction, the District Court, McKenna, J., held that scotch seller established a significant likelihood of confusion.

Motion granted.
West Headnotes
**Trademarks 382T** ☞**1704(9)**

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(F) Injunctions
         382Tk1701 Preliminary or Temporary Injunctions
            382Tk1704 Grounds and Subjects of Relief
               382Tk1704(9) k. Similarity; Likelihood of Confusion. Most Cited Cases
    (Formerly 382k620)
Seller of a brand of scotch whiskey named "Johnnie Walker Red Label" established a significant likelihood of confusion between its scotch whiskey and a beer bearing the name "Red Label From Budweiser," thus warranting preliminary injunctive relief against the beer seller in a trademark infringement suit; although the scotch seller had no current plans to enter the beer market, the recent entrance of many liquor manufacturers into the crossover flavored alcoholic beverages (FAB) market suggested that consumers were likely to associate the beer product with the scotch whiskey bearing a similar name.

MEMORANDUM AND ORDER
MCKENNA, D.J.
**\*1** Plaintiff Guinness United Distillers & Vintners B.V. ("Guinness") moves for a preliminary injunction against the marketing and sale by defendant Anheuser-Busch, Inc. ("AB") of a beer bearing the name "Red Label From Budweiser." Guinness markets and sells a brand of scotch whiskey named "Johnnie Walker Red Label ." Plaintiff claims that defendant's beer infringes, dilutes, and misappropriates plaintiff's trademark, and that the marketing and sale of "Red Label From Budweiser" beer will cause plaintiff irreparable injury. FN1 For the reasons set forth below, plaintiff's motion for a preliminary injunction is granted.

FN1. Plaintiff alleges: (1) trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark dilution in violation of N.Y. Gen. Bus. Law § 360-*l* and similar laws in other states; (5) deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 and similar laws in other states; (6) state and common law trademark infringement; and (7) state and common law misappropriation and unfair competition.

FACTS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

Anheuser-Busch produces Budweiser brand beer, the best selling beer in the United States. (English Decl. ¶ 4.) Guinness's "Johnnie Walker Red Label" scotch whisky is the world's best-selling whiskey. (Stoner Decl. ¶ 10.) Retail sales of "Johnnie Walker Red Label" scotch whisky in the United States exceeded $100 million in 2001. (Id.¶ 9.)

According to defendant, in the fall of 1999, David English ("English"), then AB's Vice President of Premium Brands, began exploring the possibility of developing a beer to compete in the "high end" beer market. (English Decl. ¶ 8; Giuggio Decl. ¶ 3.) The new product was to be targeted to men and women ages 21 to 34 who drink higher-priced import and domestic micro-brewed beers. (English Decl. ¶ 36; Giuggio Decl. ¶ 21.) English's development team, which included Steve Giuggio (" Giuggio") and Jeff Lawson ("Lawson"), explored a number of different concepts and conducted focus group research to arrive at the conclusion that "Red Label From Budweiser" was the most viable name for a high end beer from Budweiser. (English Decl. ¶¶ 10, 13, 20; Giuggio Decl. ¶¶ 8-15.) According to Giuggio, the name was chosen because:

[i]n terms of the individual components of the name, "Red" was one of the equities closely associated with the Budweiser brand that we believed could be used with a high-end beer. The color red dominates the well-known Budweiser label and the color is widely used in advertising for the brand. The word "Label" was selected because Mr. Lawson and I felt it was a word commonly used in the beer industry, including referencing a label on the bottle.

(Giuggio Decl. ¶ 7.)

According to Giuggio, the development team was generally aware of a scotch product sold as " Johnnie Walker" or "Johnnie Walker Red" but were not aware of a product sold as "Johnnie Walker Red Label" or "Red Label." (Giuggio Dep. at 41-42; Giuggio Decl. ¶ 19.) A trademark search commissioned by AB's legal department revealed extensive use of the terms "Red" and "Label" both independently and together. (English Decl. ¶ 24; Miller Dep. at 17-18; Moll Decl. Ex. 10.) AB

obtained an opinion from outside counsel and decided to use the "Red Label From Budweiser" name. (Miller Dep. at 20; English Decl. ¶ 24.)

"Red Label From Budweiser" was introduced in New York City, the first test market, in September 2001. (English Decl. ¶ 31.) New York City was selected because it is a major market for high end import and micro-brewed beers. (Id.) Approximately twenty to thirty bars, restaurants, and clubs were chosen to sell "Red Label From Budweiser" in bottle and draught form. (Id.) AB also engaged in targeted print and outdoor advertising of "Red Label From Budweiser ." (Giuggio Decl. ¶¶ 16, 17.)

**\*2** Guinness filed the present action on February 4, 2002. (Perra Decl. Ex. 1.) On February 6, 2002, Guinness's litigation counsel contacted AB's in-house counsel to inquire about AB's intentions regarding the distribution of "Red Label From Budweiser." (Def.'s Mem. in Opp'n at 11.) AB advised Guinness that AB planned to test market the product in sixty accounts in Manhattan over the next six months. (Miller Dep. ¶ 61; Hellwig Decl. ¶ 2.) On April 23, 2002, AB decided to move up the timetable and expand test marketing to Washington D.C., Los Angeles, and Las Vegas. (Def.'s Mem. in Opp'n at 11; Hellwig Decl. ¶ 3.) AB's in-house counsel contacted Guinness's in-house counsel that day to inform him of the new plan. (Hellwig Decl. ¶ 3.) The expansion to the three new cities was scheduled to begin on July 8, 2002, in approximately twenty accounts in each city, supported by local print and outdoor advertising. (Def .'s Mem. in Opp'n at 11; Hellwig Decl. ¶ 3.) Plaintiff filed the instant motion by order to show cause on June 14, 2002. A preliminary injunction hearing was held on June 27, 2002.

## LEGAL STANDARD

To obtain a preliminary injunction, plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

of hardships tipping decidedly toward the party requesting the preliminary relief ." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). In a trademark case, "a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm ... assuming that the plaintiff has a protectible mark." *Id.* (citations omitted).

### I.

The main issue is whether defendant's use of the name "Red Label From Budweiser" is "likely to confuse consumers as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification. *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1273 (S.D.N.Y.1986) (citations omitted).

Judge Friendly set forth the classic framework for analyzing this issue in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Factors to be assessed include the strength of plaintiff's mark; the similarity between the marks; the competitive proximity of the products; the likelihood that the defendant will enter the plaintiff's market; actual confusion; the good faith of the defendant; the quality of defendant's product; and the sophistication of the buyers. *Id.* at 495. Other variables may also be taken into account, and no single factor is determinative. *W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993). "When considering the likelihood of confusion .... a court must take into account the overall context in which the marks appear and the totality of factors that could cause consumer confusion." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 66 (2d Cir.2000) (citations omitted).

*A. Strength of Plaintiff's Mark*

*\*3* The strength of a mark refers to the ability of the mark to identify the source of the goods. *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979); *Jim Beam Brands Co., Inc. v. Beamish & Crawford, Ltd.,* 852 F.Supp. 196, 199 (S.D.N.Y.1994). Trademarks are classified in ascending order of strength, reflecting the degree of protection accorded, ranging from generic marks, which cannot become valid trademarks, to descriptive, suggestive, and finally, arbitrary marks, which receive the greatest protection. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). "[W]hile these categories can be useful for analytical purposes, the strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor-Doniger,* 599 F.2d at 1131.

Both "Red Label" and "Johnnie Walker Red Label" are federally registered marks for scotch whiskey. (Perra Decl. Ex. 2 ¶ 8.) As such, they are entitled to a rebuttable presumption of distinctiveness, i.e., that the marks are suggestive or arbitrary rather than descriptive. *Abercrombie,* 537 F.2d at 11. Reviewing the evidence before it, this Court finds that "Red Label" neither describes the nature of plaintiff's product nor serves as a grade designation. The Court does not agree that the hue of the scotch whiskey renders the name descriptive, especially since defendant has not alleged that the names of the other grades of scotch whiskey sold under the " Johnnie Walker" brand, i.e., "Black Label," "Gold Label," and "Blue Label," are descriptive of their contents. In addition, the Court is not convinced that "Red Label" is merely a grade designation, since the evidence shows that, although the "Red Label" name was originally utilized to differentiate that blend from other Johnnie Walker blends (Stoner Decl. ¶ 5), it currently functions as a trademark in that it identifies and distinguishes the product from other alcoholic beverages. *Hasbro,* 858 F.2d at 76. Although not every Johnnie Walker advertising campaign refers to the product as "Red Label," or focuses exclusively on "Red Label," (Moll Decl. Ex. 56, (Stoner Dep. at 47-48)), reference to the product as "Red Label" is not uncommon, and every advertisement features either a picture of the bottle, on which the name "Red

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

Label" is featured prominently, or the label itself. (Stoner Decl. Ex. 2.) The third party uses that defendant identifies (Def.'s Mem. in Opp'n at 16) are *de minimis*. Thus, the Court finds that plaintiff has established the strength of the "Red Label" mark.

### B. Similarity of the Marks

The second *Polaroid* factor examines the degree of similarity between the two marks. The pertinent inquiry is to "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." *W.W.W. Pharm. Co.,* 984 F.2d at 573 (citing *McGregor-Doniger,* 599 F.2d at 1133). Although defendant argues that the name for its product is " Red Label From Budweiser," and plaintiff's product is called "Johnnie Walker Red Label," both plaintiff's and defendant's labels give prominence to the phrase, "Red Label." "It is appropriate in determining the question of likelihood of confusion to give greater weight to the important or 'dominant ' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer." *Diner, Inc. v. Dream Kitchen, Inc.,* 95 Civ. 4130, 1995 WL 438627, at *4 (S.D.N.Y. July 24, 1995) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23.15[1] [b] (3d ed., 1995)). Although prominent use of a house brand can significantly reduce the likelihood of confusion as to the source of the parties' products, *Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000), the Budweiser name appears in relatively small font on the beer bottle, making it unlikely to alleviate consumer confusion. Similarly, the words "Red Label" are much more prominent in defendant's advertising than "From Budweiser." In addition, the Court notes the recent trend in the alcohol industry for distributors of spirits to leverage the equity of their brands by applying their names to ready-to-drink malt based alcoholic beverages, also known as flavored alcoholic beverages ("FABs"). (Stoner Decl. ¶ 23.) For example, Guinness has introduced a line extension of the Smirnoff vodka brand under the name " Smirnoff Ice," and AB has introduced a line extension of the Bacardi rum brand under the name

"Bacardi Silver." (Id.¶¶ 23, 24.) These products are technically beer products, since they are malt based, and compete directly with beer. (Id.¶ 23.) Given the current popularity of line extensions, the use of a house brand might suggest to consumers a collaboration between two prominent purveyors of alcoholic beverages.

**\*4** Although plaintiff's scotch bottle is not likely to be confused with defendant's beer bottle (Def.'s Mem. in Opp'n at 24), the fact that the bottles are distinctive does not make it less likely that consumers will assume that "Red Label From Budweiser" beer is a new FAB associated with " Johnnie Walker Red Label" scotch whisky.[FN2] The similarities between the names of the products, combined with the fact that they are both alcoholic beverages marketed to an upscale consumer make it likely that consumers will form the impression that AB's product originated with Guinness. The Court finds that the marks are confusingly similar.

> FN2. Similarly, plaintiff's expert has concluded that "given the circumstances under which Red Label beer is currently being sold, confusion is not likely to occur among 'end user' purchasers who order such a product and are likely to know whether they desire a beer or a scotch whiskey product ..." (Moll Decl. in Opp'n, Ex. 1 (Johnson Decl. ¶ 9)), correctly identifying that "end user" confusion is not the type of confusion at issue in this case.

### C. Competitive Proximity

The third *Polaroid* factor is the competitive proximity of the products. "[A] trademark owner is entitled to protection against the use of its mark not only on the particular product it markets, but also on a closely related product that consumers could reasonably believe is manufactured or sponsored by the first user." *McDonald's Corp.,* 649 F.Supp. at 1276. The factors a court may consider include the products' relative market position and audience appeal. *W.W.W. Pharm. Co.,* 984 F.2d at 573. Plaintiff's and defendant's products are both alcoholic beverages sold in bars, nightclubs, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

restaurants and are both targeted to an upscale consumer. Although the Court recognizes that beer and scotch are different products, the recent popularity of FABs has narrowed the gap between these two segments of the alcoholic beverage market. Considering the introduction of these " crossover" beverages, it is reasonable to assume that consumers may believe that "Red Label From Budweiser" beer is a FAB produced by the same company that produces "Johnnie Walker Red Label" scotch whisky, or that the product is a joint effort. Therefore, the third *Polaroid* factor suggests that consumer confusion is likely.

### D. Bridging the Gap

This *Polaroid* factor addresses the likelihood that the plaintiff will bridge the gap between plaintiff's and defendant's markets by entering a related field in the future. *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976). Although plaintiff states that it has no intention of entering the beer market or creating a FAB based on its Johnnie Walker products (Nichols Dep. at 238-39), "[i]t is now well settled in this country that a trade-mark protects the owner against not only its use upon the articles to which he has applied it, but upon such other goods as might naturally be supposed to come from him." *L.E. Waterman Co. v. Gordon,* 72 F.2d 272, 273 (2d Cir.1934). As discussed above, consumers are likely to believe that defendant's product represents plaintiff's foray into the beer or FAB markets. Therefore, even though plaintiff has admitted that it does not intend to bridge the gap, this factor still weighs in favor of plaintiff, because both parties operate in a (admittedly large and diverse) market for alcoholic beverages in which distinctions between beer and liquor are blurring.

### E. Actual Confusion

**\*5** "[A]ctual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear,* 799 F.2d at 875 (citation omitted). However, the inability to show actual

confusion in some circumstances may weigh against a plaintiff. *Hasbro,* 858 F.2d at 78 (citing *McGregor-Doniger,* 599 F.2d at 1136).

Defendant submits survey evidence showing a two percent level of actual confusion among consumers. (Ostberg Decl. ¶ 16 & Ex. 1.) "The survey shows that only 2% of those consumers who had recently ordered a premium-priced or higher-priced brand of beer in a restaurant, club or bar thought that Red Label From Budweiser came from or was approved by the company which markets Johnnie Walker Red Label scotch whisky." (Id.) Such a finding is evidence of no confusion. Plaintiff did not conduct a confusion survey, and "[t]he lack of survey evidence counts against finding actual confusion." *Merriam-Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 72 (2d Cir.1994) (citation omitted). Plaintiff's evidence concerning confusion among bartenders (Perra Decl. Ex. 12), including James Moy's ("Moy") survey (Moll Decl. Ex. 59, (Moy Dep.); Moy Decl.), does not bear on the likelihood that purchasing consumers will be confused and does not address confusion as to source, affiliation, or sponsorship. Plaintiff fails to submit evidence showing that purchasing consumers are confused.

While this factor weighs in favor of defendant, since sales of "Red Label From Budweiser" have been limited, the Court notes that there has been little chance for actual confusion at this time.

### F. Defendant's Good Faith in Adopting the Mark

The sixth *Polaroid* factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 397 (2d Cir.1995) (citations and internal quotations omitted). Plaintiff has failed to come forward with evidence that defendant intended to appropriate plaintiff's good will or create confusion between the products. The fact that defendant was aware of plaintiff's prior registration of a similar trademark and sought the opinion of counsel does not support the conclusion that defendant acted in bad faith. *W.W.W. Pharm. Co.,* 984 F.2d at 575;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 6

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

*Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.* 820 F.Supp. 763, 778 (S.D.N.Y.1993). Seeking the advice of counsel on trademark issues is a standard practice and a negative inference should not be drawn from it.

### G. Quality of Defendant's Product

"This factor reflects the law's recognition that a prior owner should not be subjected to the risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Proctor & Gamble Co. v. Johnson & Johnson, Inc. .,* 485 F.Supp. 1185, 1202 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1203 (2d Cir.1980). Since plaintiff does not allege that defendant's product is in any way inferior, this factor is neutral.

### H. Sophistication of Consumers

*6 "In assessing this factor, one must look to '[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." ' *Merriam-Webster,* 35 F.3d at 72 (quoting *McGregor-Doniger,* 599 F.2d at 1137). This factor is "based upon a notion that unsophisticated buyers increase the likelihood of confusion." *Sara Lee Corp. v. Aris Indus., Inc.,* No. 00 Civ. 5649, 2001 WL 607005, at *5 (S.D.N.Y. Jan.4, 2001) (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987)).

Beer and scotch are relatively low cost products, and the average consumer is not likely to seek to identify the true manufacturer of these products. *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1363 (E.D.Pa.1972) ("the average liquor consumer is not likely to exercise a high degree of care in his purchases of a relatively low cost item such as a bottle of scotch"). While recognizing that upscale consumers, the alleged consumers of both plaintiff's and defendant's products, are perhaps more sophisticated than other buyers of alcoholic

beverages, considering the often chaotic conditions under which alcoholic beverages are purchased in bars, and the impulse nature of these purchases, this factor supports a likelihood of confusion.

### II.

A district court should generally consider delay in assessing irreparable harm. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 39 (2d Cir.1995) (citations omitted). Defendant argues that plaintiff's nine month delay in seeking a preliminary injunction precludes the granting of relief, citing *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) ( "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement" (citation omitted)); (Def.'s Mem. in Opp'n at 37-38). However, the Second Circuit has also stated that " [t]he cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition." *Tom Doherty Assocs.,* 60 F.3d at 39 (citations omitted). Based on the limited distribution and media penetration of " Red Label From Budweiser" to date, this Court will not deny injunctive relief based on plaintiff's delay in seeking relief.

### III.

Considering the totality of the circumstances, and in light of the similarity of the marks and the competitive proximity of the products, the Court finds that there is a significant likelihood of confusion between plaintiff's "Johnnie Walker Red Label" scotch whiskey and defendant's "Red Label From Budweiser" beer. Although plaintiff has admitted that it has no current plans to "bridge the gap" and enter the beer market, the recent entrance of many liquor manufacturers into the "crossover"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039
**(Cite as: Not Reported in F.Supp.2d)**

FAB market suggests that consumers are likely to associate AB's beer product with the scotch whiskey bearing a similar name. Although defendant's confusion survey has revealed a *de minimis* amount of actual confusion, this evidence, considering the limited distribution to date of the AB product, is not enough to overcome the Court's conclusion of likelihood of confusion. The Court's findings that defendant acted in good faith, that defendant's product is not inferior to plaintiff's, and that purchasers of upscale alcoholic beverages may be slightly more sophisticated than purchasers of other beverages, similarly do not change the outcome. Plaintiff is likely to succeed on the merits, and will, absent injunctive relief, be irreparably harmed. Accordingly, the Court grants plaintiff's motion for a preliminary injunction.[FN3]

> FN3. Because plaintiff is entitled to a preliminary injunction on the basis of trademark infringement, the Court need not reach plaintiff's dilution and state and common law claims.

### IV.

*7 For the foregoing reasons, defendant is enjoined, pursuant to Fed.R.Civ.P. 65, during the pendency of this action, from marketing beer under a name including the words "Red Label". Subject to further briefing by the parties regarding the appropriate amount of security to be given by *id.* 65(c), plaintiff is to give security conforming to *id.,* within three business days hereof, in the amount of $250,000.

SO ORDERED.

S.D.N.Y.,2002.
Guiness United Distillers & Vintners B.V. v. Anheuser-Bush, Inc.
Not Reported in F.Supp.2d, 2002 WL 1543817 (S.D.N.Y.), 64 U.S.P.Q.2d 1039

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092
**(Cite as: Not Reported in F.Supp.2d)**

C
Philip Morris USA Inc. v. Cowboy Cigarette Inc.
S.D.N.Y.,2003.

United States District Court,S.D. New York.
PHILIP MORRIS USA INC., Plaintiff,
v.
COWBOY CIGARETTE INC., Defendant.
**No. 03 Civ. 2292(JSR).**

Dec. 2, 2003.

Cigarette manufacturer moved for summary judgment on trade dress infringement claim brought against competitor. The District Court, Rakoff, J., held that: (1) manufacturer, whose product prominently featured a cigarette-smoking cowboy integrated into a western motif, established trade dress infringement claim against competitor, whose cigarettes had been advertised using similar cowboy imagery, and whose cigarette pack, like manufacturer's cigarette pack, was red and white, and prominently featured a triangular wedge, and (2) likelihood of confusion between manufacturer's product and competitor's created a presumption of irreparable harm for purposes of manufacturer's prayer for injunctive relief.

Motion granted.
West Headnotes
**[1] Trademarks 382T ⚖══1119**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
        382Tk1117 Trade Dress
            382Tk1119 k. Particular Cases. Most Cited Cases
        (Formerly 382k360)
Cigarette manufacturer, whose product prominently featured a cigarette-smoking cowboy integrated into a western motif, established trade dress infringement claim against competitor, whose cigarettes had been advertised using similar cowboy imagery, and whose cigarette pack, like manufacturer's cigarette pack, was red and white, and prominently featured a triangular wedge; competitor's trade dress created a likelihood of confusion between the two products, particularly in light of fact that competitor's product relied, even to its very name, on the very image and association that was central to manufacturer's marketing campaign. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[2] Trademarks 382T ⚖══1707(4)**

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(F) Injunctions
            382Tk1701 Preliminary or Temporary Injunctions
            382Tk1707 Proceedings
                382Tk1707(4) k. Presumptions and Burden of Proof. Most Cited Cases
        (Formerly 382k620)
Likelihood of confusion between manufacturer's product and competitor's created a presumption of irreparable harm for purposes of manufacturer's prayer for injunctive relief on its trade dress infringement claim. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

*MEMORANDUM ORDER*
RAKOFF, J.
**\*1** By Order dated November 24, 2003, the Court granted plaintiff Philip Morris USA Incorporated (" Philip Morris") summary judgment in its favor, and concomitant injunctive relief, on its trade dress infringement claim against defendant Cowboy Cigarette Incorporated ("Cowboy"). This Memorandum Order states the reasons for that ruling and additionally disposes of the remainder of the case.

The pertinent facts, either as undisputed or, where disputed, taken most favorably to defendant (the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092
**(Cite as: Not Reported in F.Supp.2d)**

non-moving party), are as follows:

[1] Philip Morris makes the cigarette brand called Marlboro, whose market share currently exceeds 35% of the United States market for cigarettes. Declaration of Roy Anise, dated September 8, 2003 ("Anise Decl.") at ¶ 27. Cowboy, a company organized on April 11, 2002, makes "Cowboy" cigarettes, a small local brand that did not enter the market until June 19, 2002. Declaration of Irene Hudson, dated September 8, 2003 ("Hudson Decl."), Exh. C (Deposition of Mark Goldberg (" Goldberg.Dep.")) at 10; Affidavit of Mark Goldberg, dated October 22, 2003 ("Goldberg Aff." ) at ¶ 7.

Since 1963, the great majority of advertisements for Marlboro cigarettes have prominently featured a cigarette-smoking cowboy integrated into a western motif. Anise Decl. ¶ 19. Although prior to that time other cigarette brands occasionally made use of a western motif, the advertisements of Marlboro were so saturated with such imagery (Anise Decl. Exh. E-G, J-L, N-O) that they came to be commonly referred to as the "Marlboro Man" and " Marlboro Country." Hudson Decl. Exh. B1, B2

Nonetheless, since their entry into the marketplace in 2002, "Cowboy" cigarettes have been advertised using similar cowboy imagery. Hudson Decl., Exh. E; Anise Decl., Exh. Q. Such imagery also appears on the Cowboy cigarette pack, which is, like the Marlboro cigarette pack, red and white, and prominently features a triangular wedge. *See* Defendant's Exhibits A & B, presented at oral argument, November 7, 2003.

Against the background of these and other undisputed facts, *see infra,* the issue presented on the instant motion for summary judgment on the trade dress infringement claim is whether such activity by Cowboy infringes the Marlboro trade dress, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). By "trade dress" is meant a product's total image and appearance. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). As the Court of Appeals stated in *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993, 999

(2d Cir.1997), "[t]he concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *See also LeSportsac, Inc. v. Kmart Corp.,* 754 F.2d 71, 75 (2d Cir.1985) (same).

To prevail on a claim of trade dress infringement, a plaintiff must prove three essential elements, to wit: 1) that its trade dress is not functional; 2) that its trade dress is either inherently distinctive or has acquired a secondary meaning in the marketplace; and 3) that there is a likelihood of confusion between its trade dress and that of defendant. *Nora Beverages v. The Perrier Group of America, Inc.,* 269 F.3d 114, 118-119 (2d Cir.2001).

**\*2** Here, defendant does not dispute that the Marlboro trade dress is not functional. Hence, the first of the three elements has been established.

With respect to the second element, plaintiff relies heavily on *Philip Morris, Inc. v. Star Tobacco,* 879 F.Supp. 379 (S.D.N.Y.1995) (*"Star Tobacco"* )-a case very substantially similar to the instant case-for the proposition that Marlboro's trade dress is inherently distinctive, *id.* at 383. However, this Court, while in agreement with the legal analysis in *Star Tobacco,*[FN1] takes note that in that case the defendant acquiesced in Philip Morris's assertion that no cigarette trade dress had made use of a western motif prior to Marlboro, *id.* at 383, while there is no such acquiescence in this case. The Court need not reach the issue of inherent distinctiveness, however, because it finds that the Marlboro trade dress has acquired secondary meaning.[FN2]

> FN1. *StarTobacco* was decided in the context of a preliminary injunction. However, its reasoning is, if anything, even more compelling in a summary judgment context, where the only facts on which the Court may rely are those that are either undisputed or, where disputed, taken most favorably to non-movant.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092
**(Cite as: Not Reported in F.Supp.2d)**

FN2. In *Star Tobacco,* conversely, the Court found that, given defendant's concessions with respect to inherent distinctiveness, it need not decide the alternative issue of secondary meaning. Nonetheless, the Court volunteered that " the duration and extent of the Marlboro campaign and its commercial success are sufficient to establish a powerful, secondary meaning, were that required." *Id.* at 386.

The following six factors are considered when determining whether a trade dress has acquired secondary meaning: 1) advertising expenditures; 2) consumer studies linking the trade dress to a source; 3) unsolicited media coverage of the product; 4) sales success; 5) attempts to plagiarize the trade dress; and 6) length and exclusivity of the use of the trade dress. *See, e.g., Chum Limited v. Adam Lisowski,* 198 F.Supp.2d 530, 533 (S.D.N.Y.2002).

As to four of these factors, Philip Morris's showing of secondary meaning is essentially uncontested. These factors are advertising expenditures (Anise Decl. ¶ 28), unsolicited media attention (Hudson Decl. ¶¶ 2-5, Exh. A, B1, B2), sales success (Anise Decl. ¶ 27), and length and exclusivity of the trade dress here in issue (Anise Decl. ¶ 28). Defendant offers no contrary evidence whatever on any but the last of these factors, and in its papers defendant only expressly challenges plaintiff's showing with respect to the two remaining factors, *i.e.,* attempts to plagiarize and consumer studies. Defendant's Memorandum of Law in Opposition to Plaintiff's Summary Judgment Motion Pursuant to FRCP 56, dated October 21, 2003 ("Def.Mem.") at 10-12.

Moreover, even as to the first of these two remaining factors, *i.e.,* plagiarism, defendant is largely reduced to arguing that the undisputed fact that Philip Morris has sent cease-and-desist letters and taken other actions to combat infringement of its trade dress in more than 90 cases is not proof of plagiarism by competitors so much as efforts by a market leader to stifle competition. *See* Def. Mem. at 12. But Philip Morris also offers proof that in the five most recent such actions, over the past two

years, the cases were resolved by the defendants abandoning their allegedly infringing trade dress or similar steps, thus giving rise to an inference that the defendants were guilty of plagiarism. Declaration of Cecilia M. Dempsey, dated September 5, 2003 ("Dempsey Decl.") at ¶ 10-14. Moreover, the facts of the one fully reported case of this series, i.e., the *Star Tobacco* case, which is essentially on all fours with the instant case, expressly evidences the continuing efforts of a fringe cigarette manufacturer to try to plagiarize Marlboro's trade dress, as well as plaintiff's assiduous efforts to combat same. In the face of this proof, and with nothing offered by defendant to the contrary, no reasonable fact-finder could fail to conclude that plaintiff has proven repeated instances of plagiarism.

**\*3** As for the sixth favor, plaintiff concedes that it has not offered any consumer studies evidencing secondary meaning. But given the absence of consumers studies to the contrary, and given the fact that plaintiff has established all five of the other factors indicating secondary meaning (four of which are not even contested by defendant), it is plain that plaintiff has established secondary meaning beyond any genuine dispute.

Turning then to the third element, likelihood of confusion, this element is to be assessed in terms of the familiar *"Polaroid"* factors: 1) strength of trade dress; 2) similarity between trade dresses; 3) proximity of the products; 4) likelihood that plaintiff will "bridge the gap" between the products; 5) actual confusion; 6) defendant's good faith; 7) quality of defendant's product; and 8) sophistication of the buyers. *Polaroid Corp. v. Polaroid Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961).

Regarding the first *Polaroid* factor, the undisputed duration and commercial success of the Marlboro campaign establish the strength of the trade dress. While defendant attempts to resist that conclusion by noting that prior to the advent of the Marlboro campaign other cigarettes also used a cowboy motif in promoting their products (Def.Mem., Exh. C), a little over half of the advertisements defendant adduces in this regard antedate the advent of the Marlboro campaign in 1963-thus, ironically,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

attesting to the strength subsequently developed by the Marlboro image. Of the remaining images after 1963, an examination of the actual images reveals that no reasonable fact-finder could conclude that these in anyway resemble the Marlboro trade dress. For example, in one advertisement, bikini-clad models flank a male model in a cowboy hat. In another, a female model in a cowboy hat and a tank top advertises cigarettes. Neither these nor many other of defendant's proffered advertisements reflect anything like the "Marlboro Man" or "Marlboro Country."

As to the second *Polaroid* factor, it cannot reasonably be disputed that the Cowboy product relies, even to its very name (not to mention its total use of the Cowboy imagery), on the very image and association that is central to the Marlboro campaign. It may also be noted that, while not all Marlboro packs contain the cowboy image on the packaging itself (though all Cowboy cigarettes do), the packaging of the two brands is otherwise very similar, consisting of a white wedge on a red background. Exh. A, B., presented at oral argument, November 7, 2003.

As to the third *Polaroid* factor, it is undisputed that both products are king-size filter cigarettes and therefore are highly proximate.

The fourth *Polaroid* factor, bridging the gap, which is concerned with protecting the senior user's interest in being able to enter a related field, is not a relevant consideration in the case at bar. *Star Tobacco,* 879 F.Supp. at 386.

With respect to the fifth *Polaroid* factor, plaintiff concedes that it has introduced no evidence of actual confusion. But it is undisputed that defendant's product not only has a very limited scope of distribution (essentially Greenwich Village and certain parts of Brooklyn), but also has only been marketed for a very short period of time. Hudson Decl., Exh. D (Deposition of John Keough) at 105-106, Goldberg Aff. ¶ 7. "Where, as in the instant case, the junior user's product has been on the market a relatively short time, lack of proof of actual confusion does not warrant an inference against the senior user on the issue of probable

confusion." *Star Tobacco,* 879 F.Supp. at 386-7.

**\*4** Regarding the sixth *Polaroid* factor, plaintiff has proffered strong evidence of defendant's bad faith, not only in the "copy-cat" quality of its trade dress but also in the inherently suspicious claims by defendant's president that he was unaware of the Marlboro cowboy until this case was brought-this, even though Cowboy advertises using the slogan, " If you love Marlboro, you'll love Cowboy." Anise Decl., Exh. Q. Nonetheless, defendant has offered protestations of good faith sufficient to make this a jury question, and hence this factor cannot be resolved in plaintiff's favor on summary judgment.

As to the seventh *Polaroid* factor, *i.e.,* quality, defendant argues, and plaintiff disputes, that Cowboy's cigarettes are equal to or superior in quality to Malboro cigarettes. Hudson Decl, Exh. C (Goldberg Dep.) at 60; Plaintiff's Memorandum of Law In Support of its Motion for Summary Judgment, dated September 8, 2003, at 16. But taking this dispute most favorably to defendant only serves to emphasize the potential for confusion, for, if anything, "the good quality of the alleged infringer's product actually may increase the likelihood of confusion as to source". *Star Tobacco,* 879 F.Supp. at 387.

Similarly, as to the eighth *Polaroid* factor, while defendant alleges, and plaintiff disputes, that cigarette purchasers are sophisticated, here, even if defendant's position is accepted, it actually cuts in the plaintiff's favor, because sophisticated purchasers are, if anything, more likely to be aware of Marlboro's trade dress and hence to perceive seeming connections between Marlboro and Cowboy cigarettes. *See Star Tobacco,* 879 F.Supp. at 388.

In short, on any reasonable application of the eight *Polaroid* factors, plaintiff has proved beyond genuine dispute that Cowboy's trade dress creates a likelihood of confusion between the two products-specifically, the likelihood that a potential consumer may be misled into associating Cowboy cigarettes with Marlboros. Since plaintiff has therefore established by undisputed facts all three elements of its claim of trade dress infringement, it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 5

Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092
**(Cite as: Not Reported in F.Supp.2d)**

is entitled to summary judgment in its favor on that claim.

[2] As to relief, the only relief plaintiff now seeks on this claim is injunctive relief. This, too, it is entitled to, since the likelihood of confusion creates a presumption of irreparable harm that defendant has failed to refute. *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000).

Accordingly, as set forth in the Order of November 24, 2003, plaintiff is entitled to an injunction on the following terms: Beginning immediately, defendant is permanently enjoined from packaging, advertising, distributing or selling cigarettes or any other tobacco product by use of the word "cowboy," or "Cowboy," or depicting a cowboy, cowboy on horseback, cowboy herding cattle or hoses, or similar motif.

Furthermore, since plaintiff, after receiving the November 24 Order, notified the Court that it no longer felt it necessary to pursue any other claims or remedies, the Clerk of the Court is hereby directed to enter final judgment, granting the aforesaid permanent injunctive relief on the trade dress infringement claim and otherwise dismissing the Complaint without prejudice.

**\*5** CLERK TO ENTER JUDGMENT.

SO ORDERED.

S.D.N.Y.,2003.
Philip Morris USA Inc. v. Cowboy Cigarette Inc.
Not Reported in F.Supp.2d, 2003 WL 22852243 (S.D.N.Y.), 70 U.S.P.Q.2d 1092

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.